**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

WILLIAMSBURG CLIMBING GYM
COMPANY LLC and FIFTH CONCERTO
HOLDCO, INC.,

          Plaintiffs and
          Counterclaim-Defendants,

     v.

RONIT REALTY LLC,

          Defendant and
          Counterclaim-Plaintiff.

Case No. 1:20-cv-02073-FB-RML

### DEFENDANT/COUNTERCLAIM-PLAINTIFF RONIT REALTY LLC'S MEMORANDUM OF LAW IN SUPPORT OF MOTION FOR <u>SUMMARY JUDGMENT ON LIABILITY</u>

STEIN ADLER DABAH ZELKOWITZ LLP
Adam J. Stein, Esq.
Matteo J. Rosselli, Esq.
Samuel J. Bazian, Esq.
1633 Broadway, 46th Floor
New York, New York 10019

*Attorneys for Defendant/Counterclaim-Plaintiff*
RONIT REALTY LLC

February 23, 2021

# TABLE OF CONTENTS

Page

INTRODUCTION ...................................................................................................1

FACTUAL BACKGROUND ...................................................................................2

    A.    The Parties .................................................................................................3

    B.    The Lease and Guaranty .........................................................................3

           1.    Ronit's Substantial Up-Front Commitment ...............................4

           2.    The Lease's Allocation of the Financial Risk of Exigencies.....................5

    C.    Ronit Agrees to Defer Rent Payments .................................................7

    D.    Ronit Pays Over $1.2MM in Construction Contributions to Williamsburg Climbing ..........................................................................7

    E.    Williamsburg Climbing Requests Another $1.5MM in Construction Contributions *After* the COVID-19 Outbreak..........................................8

    F.    Williamsburg Climbing Purports to Terminate the Lease .......................8

    G.    Williamsburg Climbing Leaves the Partially Built Gym Riddled with Mechanic's Liens ..............................................................9

    H.    Brooklyn Boulders Seeks Space Elsewhere and Continues to Operate During the Pandemic..................................................................10

LEGAL STANDARD..............................................................................................11

ARGUMENT ..........................................................................................................11

    POINT I: PLAINTIFFS CANNOT AVOID CONTRACTUAL LIABILITY BY CLAIMING IMPOSSIBILITY OR FRUSTRATION ....................................11

    A.    The Lease Precludes Plaintiffs' Common Law Defenses.......................11

    B.    The Lease Has Neither Been Frustrated Nor Rendered Impossible .....................21

    POINT II: WILLIAMSBURG CLIMBING HAS FURTHER BREACHED THE LEASE BY FAILING TO DISCHARGE MECHANICS' LIENS ........24

    POINT III: FIFTH CONCERTO HAS BREACHED THE GUARANTY .....................25

CONCLUSION........................................................................................................25

# TABLE OF AUTHORITIES

Page

## Cases

*35 E. 75th St. Corp. v. Christian Louboutin L.L.C.*,
   2020 N.Y. Misc. LEXIS 10423 (Sup. Ct. N.Y. Cty. Dec. 9, 2020) ..................... 13, 16, 22-23

*407 East 61st Garage, Inc. v. Savoy Fifth Avenue Corp.*,
   23 N.Y.2d 275 (1968) ...................................................................................... 21

*476 Grand, LLC v. Dodge of Englewood, Inc.*,
   2012 N.J. Super Unpub. LEXIS 457 (N.J. App. Div. Mar. 2, 2012) ......................................17

*Axginc Corp. v. Plaza Automall, Ltd.*,
   (ARR)(VMS), 2017 U.S. Dist. LEXIS 227928 (E.D.N.Y. Feb. 21, 2017) ..................... 15, 16

*B. v. D. Co. v. Marine Midland Bank-New York*,
   60 A.D.2d 544 (1st Dep't 1977) ................................................................... 17

*Backal Hospitality Group LLC v. 627 West 42nd Retail LLC*,
   2020 N.Y. Misc. LEXIS 4050 (Sup. Ct. N.Y. Cty. Aug. 3, 2020) ......................................... 15

*Baldiga v. C.A. Acquisition Corp.*,
   496 B.R. 49, 55 (Bankr. D. Mass. 2013) .................................................................19

*Bayou Place Limited Partnership v. Alleppo's Grill, Inc.*,
   2020 U.S. Dist. LEXIS 43960 (D. Md. Mar. 13, 2020) ........................................ 20

*CAMOFI Master LDC v. College Partnership, Inc.*,
   452 F. Supp. 2d 462 (S.D.N.Y. 2006) ................................................................. 18

*South College Street, LLC v. Charlotte School of Law*,
   2018 NCBC 80 (N.C. Super. Ct. Mecklenburg Cty. 2018) ............................................. 17, 24

*Colonial Operating Corp. v. Hannan Sales & Service*,
   265 A.D. 411 (2d Dep't 1943) .......................................................................... 23, 24

*Crown IT Servs. v. Koval-Olsen*,
   11 A.D.3d 263 (1st Dep't 2004) ...................................................................... 21

*Cut-Outs, Inc. v. Man Yun Real Estate Corp.*,
   286 A.D.2d 258 (1st Dep't 2001) ........................................................................ 17

*Dr. Smood N.Y. LLC v. Orchard Houston, LLC*,
   2020 N.Y. Misc. LEXIS 10087 (Sup. Ct. N.Y. Cty. Nov. 2, 2020) ....................................... 23

*In re Fontana D'Oro Foods, Inc.*,
   107 A.D.2d 808 (2d Dep't 1985) ........................................................................ 12

## TABLE OF AUTHORITIES
*(cont'd)*

Page

*In re Stock Exchs. Options Trading Antitrust Litig.,*
2005 U.S. Dist. LEXIS 13734 (S.D.N.Y. July 11, 2005) ...................................... 12

*Gander Mountain Co. v. Islip U-Slip LLC,*
923 F. Supp. 2d 351 (N.D.N.Y. Feb. 11, 2013) ....................................... 22

*Internet Law Library, Inc. v. Southridge Capital Management, LLC,*
2005 U.S. Dist. LEXIS 32299 (S.D.N.Y. Dec. 12, 2005) ..................................... 17

*Lake Altoona Rehabilitation & Protection District v. Jereczek,*
2018 Wisc. App. LEXIS 331 (Wis. Ct. App. Mar. 20, 2018) ................................19

*Internet Law Library, Inc. v. Southridge Capital Management, LLC,*
2005 U.S. Dist. LEXIS 32299 (S.D.N.Y. Dec. 12, 2005) .......................................17

*LIDC I, LLC v. Sunrise Mall, LLC,*
46 Misc. 3d 885 (Sup. Ct. Nassau Cty. Oct. 27, 2014) ...........................................17

*Light's Jewelers, Inc. v. N.Y. Telephone Co.,*
182 A.D.2d 965 (3d Dep't 1992) ....................................... 18

*Louis Scherzer Partners L.P. v. FDIC,*
1996 U.S. App. LEXIS 29999 (9th Cir. Nov. 15, 1996) ......................................... 12

*Man Roland, Inc. v. Quantum Color Corp.,*
57 F. Supp. 2d 576 (N.D. Ill. 1999) .......................................19

*Merhav Ampal Group, Ltd. v. Merhav (M.N.F.) Ltd., No. 14-2385(SMB),*
2015 Bankr. LEXIS 2934 (Bankr. S.D.N.Y. Sept. 2, 2015) ...................................... 11

*Noble Am. Corp. v. CIT Group/Equip. Fin., Inc.,*
2009 N.Y. Misc. LEXIS 6780 (Sup. Ct. N.Y. Cty. Dec. 8, 2009) ........................................ 21

*Northway McGuffey College, Ltd. v. Brown,*
2015 Ohio Misc. LEXIS 15633 .......................................17

*One World Trade Ctr. LLC v. Cantor Fitzgerald Securities,*
6 Misc. 3d 382 (N.Y. Sup. Ct. N.Y. Cty. Oct. 7, 2004) ....................................... 18

*Robitzek Investing Co. v. Colonial Beacon Oil Co.,*
265 A.D. 749 (1st Dep't 1943) ....................................... 22

*RPH Hotels 51st St. Owner, LLC v. HJ Parking LLC,*
2021 N.Y. Misc. LEXIS 373 (Sup. Ct. N.Y. Cty. Jan. 28, 2021) .......................................... 23

## TABLE OF AUTHORITIES
*(cont'd)*

Page

*Sage Realty Corp. v. Jugobanka, No. 95 Civ. 0323,*
    1998 U.S. Dist. LEXIS 15756 (S.D.N.Y. Oct. 8, 1998) ........................................................ 15

*Stanley Works v. Halstead New Eng. Corp.,*
    2001 Conn. Super. LEXIS 1382 (Conn. Super. Ct. May 18, 2001) ...................................... 17

*Thompson v. County of Franklin,*
    987 F. Supp. 111 (N.D.N.Y. 1997) ...................................................................................... 11

*United Artists' Theatre Circuit, Inc. v. Kaufman Bedrock Astoria I LLC,*
    Index No. 705911/2020, Doc. No. 60 (Sup. Ct. Queens Cty. Dec. 9, 2020) .............. 13, 16-17

*United States v. General Douglas MacArthur Senior Village, Inc.,*
    508 F.2d 377 (2d Cir. 1974) ............................................................................................... 12

*Valentino U.S.A., Inc. v. 693 Fifth Owner LLC,*
    Index No. 652605/2020, Doc. No. 44 (Sup. Ct. N.Y. Cty. Jan. 27, 2021) ................. 14, 16-17

*Victoria's Secret Stores, LLC v. Herald Square Owner LLC,*
    70 Misc. 3d 1206[A], 2021 NY Slip Op 50010[U] (Sup. Ct. N.Y. Cty. Jan. 7, 2021) .......... 15

*Whelehan v. Bank of Am. Pension Plan,*
    5 F. Supp. 3d 410 (W.D.N.Y. 2014) ................................................................................... 11

## Rules and Other Auhorities

Fed. R. Civ. P. 56(a) .......................................................................................................... 11

*Corbin on Contracts: Force Majeure and Impossibility of*
*Performance Resulting from COVID-19* § 1.03[6] (Matthew Bender 2020) .............................18

*Restatement (Second) of Contracts*
    § 261 cmt. c .............................................................................................................. 12, 20

*Restatement (Third) of Restitution and Unjust Enrichment*
    § 34 cmt. a (2010) ............................................................................................................ 12

*Williston on Contracts* § 77:97 .............................................................................................24

Defendant/Counterclaim-Plaintiff Ronit Realty LLC ("Ronit") respectfully submits this memorandum of law in support of its motion for summary judgment on liability.

## INTRODUCTION

This action was brought by a sophisticated commercial tenant asking this Court to sign off on the total abandonment of its long-term lease obligations, wrongfully utilizing the global pandemic as a pretext to shop for cheaper rental space elsewhere. Plaintiff Williamsburg Climbing Gym Company LLC ("Williamsburg Climbing") and Ronit are the parties to a lease, dated November 1, 2018, under which Williamsburg Climbing agreed to lease from Ronit over 30,000 square feet of space in Williamsburg, Brooklyn for an initial term of ten years (the "Lease"). Plaintiff Fifth Concerto Holdco, Inc. ("Fifth Concerto" and together with Williamsburg Climbing, "Plaintiffs") is the sole member of Williamsburg Climbing and the guarantor of the Lease.

Williamsburg Climbing is an entity formed by Brooklyn Boulders, which is a private equity-backed, high-end fitness brand that operates rock climbing, co-working, and entertainment facilities. Despite Ronit's massive up-front investment under the Lease—including over $1.2MM in contributions towards the buildout of a customized climbing facility—Williamsburg Climbing abruptly notified Ronit in May 2020 that it was terminating the Lease months before it was even set to open its facility. Citing the COVID-19 pandemic, Plaintiffs seek: (i) a declaratory judgment that, under the doctrine of frustration of purpose, they are relieved of their obligations; and (ii) rescission of the Lease based upon the related doctrine of impossibility of performance. Given Plaintiffs' abandonment of the partially built gym and their failure to make payments or clear mechanic's liens, Ronit has filed Counterclaims for, *inter alia*, breach of the lease and guaranty.

Plaintiffs' common law defenses are foreclosed by multiple Lease provisions, which expressly allocate the risk of unforeseen financial exigencies to Williamsburg Climbing, such as: (i) a *force majeure* provision which requires Williamsburg Climbing to pay rent even if

governmental laws or regulations prevent or substantially interfere with its ability to perform under the Lease; (ii) a requirement that rent is to be paid "without any offset, set-off, counterclaim or deduction whatsoever", which, under New York law, constitutes a waiver of all defenses; (iii) a broad "No Liability" clause that explicitly precludes Williamsburg Climbing from avoiding its obligations based upon happenings outside of Ronit's control; and others.

In any event, Williamsburg Climbing's ability to perform under the Lease *has not* been frustrated or rendered impossible by the pandemic.  In fact, weeks after the onset of the pandemic, Williamsburg Climbing asked Ronit for more than $1.5MM towards its build-out.  Then, just weeks after purporting to terminate the Lease without seeking a forbearance or any meaningful dialogue from Ronit, Brooklyn Boulders advertised that it was looking for 30,000-50,000 square feet of space elsewhere in Brooklyn, demonstrating that its plan was to find a better deal and take advantage of declining rents given the pandemic.  Moreover, *all* of Brooklyn Boulders' five locations are open for operation, including its two New York gyms which have been open since September 2020.

In recent months, New York courts have consistently rejected commercial tenants' defenses that the COVID-19 pandemic should relieve them their lease obligations, particularly where the terms of a commercial lease allocate the risk of unforeseen financial exigencies.  This Court should do the same and grant the instant motion.

## **FACTUAL BACKGROUND**

The following facts are taken from the Declaration of Jay Weitzman dated February 23, 2021 ("Weitzman Decl.") and the exhibits annexed thereto.

A. **The Parties**

Ronit, a family-owned and operated real estate developer, is the sole owner of the real property located at 83-89 Kent Avenue in Brooklyn (the "Property"). (Weitzman Decl. ¶ 3).

Williamsburg Climbing is an entity formed by Brooklyn Boulders, a self-described builder and operator of "active lifestyles facilities that foster community through rock climbing, fitness, arts + culture, active co-working, and events." (Weitzman Decl., Ex. A.) Brooklyn Boulders' brochures tout the company's facilities as "innovative + mixed-use spaces" that offer far more than rock climbing and fitness. (Weitzman Decl., Ex. B at 8, 10).

Since 2009, Brooklyn Boulders has steadily gained popularity and embarked on a mission to develop and expand its brand across the nation, while securing $48 million in funding from a large private equity firm. (Weitzman Decl. ¶¶ 7-8). According to its website, it now operates in five locations in (i) Gowanus, New York; (ii) Queensbridge, New York; (iii) Lincoln Park, Illinois; (iv) West Loop, Illinois; and (v) Somerville, Massachusetts. (Weitzman Decl., Ex. C).

B. **The Lease and Guaranty**

On November 30, 2018, Ronit and Williamsburg Climbing entered into a lease, dated November 1, 2018, pursuant to which Williamsburg Climbing agreed to lease 30,598 square feet from Ronit for an initial term of ten (10) years. (Weitzman Decl., Ex. D (the "Lease")). Simultaneously, Fifth Concerto delivered an unconditional Guaranty (*Id.* Ex. F (the "Guaranty").

Williamsburg Climbing's base rent was initially set at $1,957,500.00 for the first year, with annual escalations of 2.85% plus 7.5% of Williamsburg Climbing's gross annual revenue above $8MM. (*Id.* § 41). Rent was to be unconditionally paid by Williamsburg Climbing "without any offset, set-off, counterclaim or deduction whatsoever." (*Id.*) Under the Lease, Williamsburg

Climbing has a broad scope of "Permitted Uses" for the property, while Ronit makes "no representation or guaranty…that such use is lawful or permissible." The Lease provides that Ronit:

> shall operate its business in the Demised Premises during the Term and occupy the Demised Premises primarily as an indoor climbing facility, and may also use the Demised Premises for other uses incidental to the primary use, such as for a fitness center or studios, a juice bar, a cafe, lounge, restaurant or bar (including the sale of alcohol and food), lounges, general office space in connection with the conduct of Tenant's business or for coworking, event space ( e.g., birthday parties), for the retail sale of merchandise related to Tenant's primary use and for collaborative office space.

(*Id.* § 62(a),(b)).

## 1.    **Ronit's Substantial Up-Front Commitment**

Given Plaintiffs' long-term commitment and assumption of risk under the Lease and Guaranty, Ronit agreed to make substantial up-front outlays on Williamsburg Climbing's behalf:

First, Ronit agreed to deliver the property in a condition that would accommodate the construction plans for a Brooklyn Boulders climbing gym, including: (i) providing "the shell of the Demised Premises compliant with the ADA"; (ii) "[b]ring[ing] electrical panels and plumbing taps to the sub cellar"; and (iii) "[p]rovid[ing] and install[ing] glass wall at entrance to terrace and glass railings at the perimeter of the terrace as per landlord's plans." (*Id.*, Ex. B to Lease).

Second, ***Ronit agreed to pay up to $2,775,000.00***—nearly 1½ years' base rent—toward Williamsburg Climbing's customized build-out of the facility, which would be disbursed as construction progressed (the "Construction Contributions"). (*Id.* § 54).

Third, Ronit would be permitting Williamsburg Climbing to build out the property for its unique purpose of a climbing gym, which could not be easily repurposed for a new tenant if Williamsburg Climbing defaulted and vacated the premises. As set forth in Williamsburg Climbing's plans, the facility would contain large men's and women's locker rooms and showers uncommon for most commercial uses. (Weitzman Decl., Ex. E (the "Tenant's Plants")).

4

## 2.   The Lease's Allocation of the Financial Risk of Exigencies

In exchange for Ronit agreeing to build out its space specifically for Williamsburg Climbing, as well as granting two valuable ten-year options, the Lease was structured so that the financial risk of future exigences would be allocated to Williamsburg Climbing:

First, the Lease contains a broad "As Is" provision wherein Williamsburg Climbing broadly waived any claim in respect to the condition of the premises or its "fitness for use":

42.   **"As Is"**

Subject to the completion of Landlord's Work, Tenant accepts possession and occupancy of the Premises on the date hereof in their "AS-IS" condition and state of repair, subject to any and all defects therein. Tenant waives any claim or action against Landlord in respect of the condition of the Premises. **NEITHER LANDLORD, NOR ANY OF LANDLORD'S AGENTS, HAS MADE OR MAKES, ANY WARRANTY, REPRESENTATION, COVENANT OR PROMISE, EXPRESS OR IMPLIED, IN RESPECT OF THE PREMISES OR ANY PART THEREOF, EITHER AS TO THEIR FITNESS FOR USE, DESIGN OR CONDITION FOR ANY PARTICULAR USE OR PURPOSE OR OTHERWISE AS TO THE QUALITY OF THE MATERIAL OR WORKMANSHIP THEREIN, LATENT OR PATENT, IT BEING AGREED THAT ALL SUCH RISKS ARE TO BE BORNE BY TENANT**.

(Lease § 42 (emphasis in original)).

Second, the Lease contains a broad "No Liability" clause that precludes Williamsburg Climbing from avoiding its obligations based upon happenings outside of Ronit's control:

49.   **No Liability**:

Landlord shall be exempt from any and all liability for any damage or injury to person or property caused by or resulting from steam, electricity, gas, water, rain, ice or snow, or any leak or flow from or into any part of said building, or from any damage or injury resulting or arising from any other cause or happening whatsoever unless said damage or injury is caused by or is due to the negligence or willful misconduct of Landlord or any of Landlord's agents or representatives. *The obligations of Tenant hereunder shall be in no way affected, impaired or excused, nor shall Landlord have any liability whatsoever to Tenant, because Landlord is unable to fulfill, or is delayed in fulfilling, any of its obligations under this Lease* by reason of strike, other labor trouble, governmental preemption of priorities or other controls in connection with a national or other public emergency or shortages

5

of fuel, supplies or labor resulting therefrom, ***or any other cause, whether similar or dissimilar, beyond Landlord's reasonable control***.

(*Id.* § 49 (emphasis in original)).

<u>Third</u>, the Lease's *force majeure* provision specifically excludes Williamsburg Climbing's obligation to pay rent from those that may be excused in the event of, amongst other things, "governmental law or regulations which prevent or substantially interfere with the required performance . . . other casualty, acts of God, or other causes not within the control of such party":

> 59. **<u>Force Majeure</u>**:
>
> In the event that either party shall be delayed or hindered in or prevented from the performance of any covenant, agreement, work, service, or other act required under this Lease to be performed by such party, ***other than the payment of Fixed Rent or Additional Rent by Tenant***, and such delay or hindrance is due to strikes, lockouts, failure of power or other utilities, injunction or other court or administrative order, governmental law or regulations which prevent or substantially interfere with the required performance, condemnations, riots, insurrections, martial law, civil commotion, war, fire, flood, earthquake, or other casualty, acts of God, or other causes not within the control of such party, the performance of any covenant, agreement, work, service, or other act, ***other than the payment of Fixed Rent or Additional Rent by Tenant***, shall be excused for the period of delay and the period for the performance of the same shall be extended by the period.

(*Id.* § 59 (emphasis in original)).

<u>Fourth</u>, the Lease specifically allocates to Williamsburg Climbing the cost of compliance with future legal requirements, whether "foreseen or unforeseen, ordinary as well as extraordinary . . . irrespective of the cost thereof," even if such requirements impact "the purposes to which the demised premises are put, or manner of use of the demises premises":

> Tenant shall, ***at its sole cost and expense***, promptly comply with all present and future laws and ordinances of all federal, state, county and municipal governments, and appropriate departments, commissions, boards and officers thereof, and the requirements of any insurer of the Demised Premises or the Board of Fire Underwriters or any other body now or hereafter exercising similar functions, ***foreseen or unforeseen, ordinary as well as extraordinary, and whether or not the same shall presently be within the contemplation of the parties hereto*** or shall

6

involve any change of governmental policy or require repairs, alterations, equipment or additions or any work of any kind and *irrespective of the cost thereof*, which may be applicable to the demised premises including, without limitation, the fixtures and equipment thereof, the plumbing, heating, ventilating and air-conditioning systems thereof, *or the purposes to which the demised premises are put, or manner of use of the demised premises*. Tenant's obligations hereunder shall include compliance with all laws, rules, regulations or requirements relating to the operation of the Permitted Uses.

(*Id.* § 44.07 (emphasis added)).

Fifth, confirming that the risk of cessation of operations was allocated to Williamsburg Climbing, the Lease required it to procure "All Risk" business interruption or earnings insurance:

"All Risk" business interruption or earnings insurance, including the perils of sprinkler leakage, water damage, flood, earthquake, burglary and collapse, to cover loss of gross profits and continuing expenses during the period of partial or total shutdown of Tenant's business, and covering Tenant's obligation to pay all amounts of Base Rent and Additional Rent due under this Lease for a period of not less than twelve (12) months from the date of the loss.

(*Id.* § 51.02(a)(iv)).

## C.      Ronit Agrees to Defer Rent Payments

On August 14, 2019, Ronit and Williamsburg Climbing entered into a First Amendment to Lease, pursuant to which Ronit leased to Williamsburg Climbing an additional 260 square feet. (Weitzman Decl., Ex. G).  Although Williamsburg Climbing had not yet started paying full rent—that was to commence in September 2019—Ronit acceded to Williamsburg Climbing's request to defer 50% of the remainder of monthly rent payments for 2019, with a catch-up period from January 2020 through December 2020.  This accommodation was a gesture of goodwill given Williamsburg Climbing's long-term commitment under the Lease.  (*See* Weitzman Decl., Ex. H).

## D.      Ronit Pays Over $1.2MM in Construction Contributions to Williamsburg Climbing

Williamsburg Climbing commenced construction way behind schedule in November 2019. (*Id.* ¶ 24).  As Williamsburg Climbing progressed in its customized build-out, it made two

7

requests for Ronit's payment of Construction Contributions.  On or about December 19, 2019, Ronit paid to Williamsburg Climbing $468,949.64, and on or about March 27, 2020—*after* the initial outbreak of the COVID-19 pandemic—Ronit paid an additional $745,167.12 in connection with Williamsburg Climbing's second request for Construction Contributions.  (*Id.* ¶ 25).

### E.  Williamsburg Climbing Requests Another $1.5MM in Construction Contributions *After* the COVID-19 Outbreak

On March 7, 2020, Governor Cuomo issued Executive Order No. 202, pursuant to which he declared a disaster emergency for the State of New York due to the COVID-19 pandemic.  On March 16, 2020, Governor Cuomo issued Executive Order No. 202.3, pursuant to which he ordered gyms and fitness centers to cease operations effective that day.

Despite the onset of the COVID-19 pandemic, Plaintiffs never indicated to Ronit that the long-term Lease had in any way been "frustrated".  To the contrary, Williamsburg Climbing indicated that it was full steam ahead on the remaining construction, and asked for more than $1.5MM in additional funds long after gyms were shut down.  Indeed, Williamsburg Climbing issued a third request for $951,836.92 on ***March 27, 2020*** and a fourth request for $609,046.32 on ***April 14, 2020***.  (*Id.* ¶¶ 27, 28).

### F.  Williamsburg Climbing Purports to Terminate the Lease

Following Williamsburg Climbing's April 14, 2020 request for $609,046.32, Ronit made a customary request for backup information.  By letter, dated April 24, 2020, Williamsburg Climbing responded in a strangely defensive manner, threatening that "it appears that Ronit Realty is planning to not honor its contractual obligation" and that "[t]his would be completely unacceptable and would constitute a material breach of contract."  (Weitzman Decl., Ex. I).

In hindsight, it is now apparent that Williamsburg Climbing was the party that was "planning to not honor its contractual obligation" as of April 27, 2020 and, in reality, was merely

trying to grab whatever funds it could before walking away and/or to manufacture pretext to claim "a material breach of contract." On May 1, 2020, just *days* after demanding an additional $951,836.92 and reaffirming the Lease, Williamsburg Climbing informed Ronit that it was planning to terminate the Lease based upon the doctrine of "frustration of purpose." (*Id.* ¶ 31).

By letter dated May 5, 2020, Williamsburg Climbing purported to terminate the Lease effective May 1, 2020. (Weitzman Aff., Ex. J). Citing frustration of purpose and impossibility, Plaintiffs claimed that because the premises was purportedly "designed to be a 'studio-based' facility, social distancing destroys the very purpose of the lease." (*Id.*) Plaintiffs subsequently commenced this lawsuit against Ronit on May 6, 2020, and Ronit filed its Amended Counterclaims on July 23, 2020.

Despite Williamsburg Climbing's claims that its business "presumes the ability to convene classes where people are densely packed," at the time that Williamsburg Climbing noticed its termination of the Lease, an advertisement on the façade of the Property promoted, *inter alia*,"Cardio + Strength Training Area" and "Small Group Training." (Weitzman Aff., Ex. K).

By letter, dated May 7, 2020, Ronit's counsel notified Williamsburg Climbing that the purported notice of termination was invalid and that Williamsburg Climbing remained obligated to pay all rent due and comply with all other obligations under the Lease. (Weitzman Aff., Ex. L).

### G.     Williamsburg Climbing Leaves the Partially Built Gym Riddled with Mechanic's Liens

As a result of Williamsburg Climbing walking away from the Lease, Ronit has suffered and will continue to suffer enormous financial losses. Ronit not only invested over $1.2MM into the space and accommodated requests to defer hundreds of thousands of dollars of rent, but it is now left with a partially built structure that was customized specifically for Brooklyn Boulders' unique business model and cannot be easily repurposed. (*Id.* ¶ 37).

9

Adding insult to injury, on June 2, 2020, Williamsburg Climbing's general contractor filed a mechanic's lien against the Property, claiming that Williamsburg Climbing failed to pay it $1,621,642.26 for work performed, while eight subcontractors have separately filed mechanic's liens against the Property, claiming they are collectively owed $866,888.96 for work performed for Williamsburg Climbing.  (Weitzman Decl., Exs. M, N).

Despite Williamsburg Climbing's obligations under Section 43.06 to defend Ronit in connection with the mechanic's liens, it has failed to do so.  Although the liens were all filed against the Property months ago, Williamsburg Climbing has failed to discharge such liens within thirty (30) days, as required by Section 66(c) of the Lease.  (*Id.* ¶ 41).

### H.     Brooklyn Boulders Seeks Space Elsewhere and Continues to Operate During the Pandemic

Although Plaintiffs filed this lawsuit in May 2020, claiming that their development and business plans were frustrated and made impossible due to the Executive Orders and social distancing guidelines, Brooklyn Boulders' actions say otherwise.  On June 10, 2020, the real estate brokerage, TerraCRG, circulated an email advertising that Brooklyn Boulders' was seeking a new Brooklyn location for its facility, including 30,000 to 50,000 square feet with a high ceiling and open floorplan.  (Weitzman Aff., Ex. O).

Moreover, Brooklyn Boulders *has* been open and operating during the pandemic.  Anyone can make a reservation through its website for any of its five locations, and according to Brooklyn Boulders' posts on its Instagram account, the company's two New York facilities re-opened on September 2, 2020.  (Weitzman Aff., Exs. P-Q).  In addition, on December 11, 2020, Brooklyn Boulders posted on its Instagram account that, to support social distancing efforts and help its customers decide "what time to come climb," it had created an "occupancy tracker" for each of its locations, indicating the facilities' respective "peak and down-times," with there being *many* peak

10

periods.  (Weitzman Aff., Ex. R).   Customer reviews from the "Yelp" confirm that the New York locations are conducting substantial business and can become quite busy.  (Weitzman Aff., Ex. S).

## LEGAL STANDARD

Summary judgment is appropriate where "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  Summary judgment is particularly appropriate where, as here, the parties have represented to the Court that the disputed issues at bar are purely legal and that discovery is unnecessary.  *See* Min. Entry dated Oct. 13, 2020 (memorializing pre-motion conference during which all parties agreed that "[n]o discovery is needed")*; see also Thompson v. County of Franklin*, 987 F. Supp. 111, 115 (N.D.N.Y. 1997) ("[A]s the parties agree, the issues presented by these cross-motions are purely legal, this case is ripe for summary judgment."); *Whelehan v. Bank of Am. Pension Plan*, 5 F. Supp. 3d 410, 420 (W.D.N.Y. 2014) (summary judgment appropriate where party "represented to a judge of this Court that no discovery plan was needed before the filing of summary judgment motions").

## ARGUMENT

## I.    PLAINTIFFS CANNOT AVOID CONTRACTUAL LIABILITY BY CLAIMING IMPOSSIBILITY OR FRUSTRATION

### A.    The Lease Precludes Plaintiffs' Common Law Defenses

Plaintiffs' common law defenses of impossibility and frustration of purpose are barred by the Lease, which expressly allocates the financial risk of unforeseen exigencies outside of the parties' control solely to Williamsburg Climbing.  When considering a claim of impossibility or "frustration of purpose, the Court must give effect to the intent of the parties as reflected in the language and the structure of their agreement."  *Merhav Ampal Grp., Ltd. v. Merhav (M.N.F.) Ltd.*, No. 14-2385(SMB), 2015 Bankr. LEXIS 2934, at *38 (Bankr. S.D.N.Y. Sept. 2, 2015).   As explained in the Restatement of Restitution:

11

> [T]he central issue in these cases is to identify the deficiencies in the parties' bargain--a failure to perceive or to anticipate relevant circumstances--that will justify avoidance of the transaction. Where the disparity between anticipation and realization is sufficiently pronounced, and where the risk of the realized disparity has not been contractually assigned, a court may conclude that the exchange with which the parties are confronted is not the one they contemplated in making their contract. Conversely, ***a court that refuses to set aside the transaction has concluded that the outcome with which the parties are confronted, however unexpected, is within the risks that their contract has explicitly or implicitly assigned***.

Restatement (Third) of Restitution and Unjust Enrichment § 34 cmt. a (2010) (emphasis added).

In line with the Restatement's articulation, under New York law, "[n]either impossibility of performance, nor frustration of purpose analysis is applicable . . . where it can be determined that one of the parties assumed the risk of loss." *In re Fontana D'Oro Foods, Inc.*, 107 A.D.2d 808, 809 (2d Dep't), *aff'd*, 65 N.Y.2d 886 (1985) (citing *United States v. Gen. Douglas MacArthur Senior Vill., Inc.*, 508 F.2d 377, 381 (2d Cir. 1974) (impossibility applies ***only where*** "the contract ***does not*** expressly allocate the risk of the event's occurrence to either party") (emphasis added)).

In other words, these common law doctrines do "not apply if the contract allocated the risk of frustration to the frustrated party." *Louis Scherzer Partners L.P. v. FDIC*, No. 95-35732, 1996 U.S. App. LEXIS 29999, at *3 (9th Cir. Nov. 15, 1996); *In re Stock Exchs. Options Trading Antitrust Litig.*, No. 99 Civ. 0962(RCC), 2005 U.S. Dist. LEXIS 13734, at *42-43 (S.D.N.Y. July 11, 2005) ("Frustration of purpose is not applicable if the language of the contract suggests that the frustrated party's obligations will continue even in the face of an unforseen event . . . parties to a contract may bargain for a specific result if an uncontrollable event occurs rendering consideration to one party worthless."); Restatement (Second) of Contracts § 261 cmt. c ("A party may, by appropriate language, agree to perform in spite of impracticability that would otherwise justify his non-performance under the rule stated in this Section. . . . Even absent an express

agreement, a court may decide, after considering all the circumstances, that a party impliedly assumed such a greater obligation.").

Squarely on point is the recent decision in *35 E. 75th St. Corp. v. Christian Louboutin L.L.C.*, Index No. 154883/2020, 2020 N.Y. Misc. LEXIS 10423 (Sup. Ct. N.Y. Cty. Dec. 9, 2020), where an Upper East Side retailer claimed frustration of purpose and impossibility given the pandemic, while attempting to "simply walk away with nearly a decade left on [its] lease and not [to] pay any more rent." *Id.* at *7. In finding the tenant's common law defenses inapplicable, the New York County court noted that "the parties actually included a *force majeure* clause in the lease that specifically provided that it would not excuse defendant from having to pay rent" in the case of events beyond the control of the parties. *Id.* Given that contractual language, the court determined that "[p]ermitting the doctrines of impossibility or frustration of purpose to rescind an otherwise valid lease would simply allocate the loss to plaintiff. It is not this Court's role to ignore a contract and decide *sua sponte* who should take the financial loss." *Id.* at *8.

Likewise, in *United Artists' Theatre Circuit, Inc. v. Kaufman Bedrock Astoria I LLC*, Index No. 705911/2020, Doc. No. 60 (Sup. Ct. Queens Cty. Dec. 9, 2020), a movie theater argued that "the doctrines of impossibility and frustration of purpose excuse[d]" its obligation to pay rent for the months it was required to close due to the pandemic. *Id.* at 2. However, the parties' lease contained a *force majeure* clause, expressly excepting the tenant's payment obligations:

> Section 27.8 – <u>Force Majeure</u>.
> Landlord or Tenant, or both, shall be excused for the period of delay in the performance of any of their respective obligations hereunder, ***except their respective obligation to pay any sums of money due under the terms of this Lease upon and after such obligation accrues***, and shall not be considered in default, when prevented from so performing by cause or causes beyond Landlord's or Tenant's control, including, but not limited to, all labor disputes, civil commotion, war, fire or other casualty,  governmental regulations, statutes, ordinances, restrictions or  decrees, or through acts of God.

*Id*. at 4 (emphasis added).

Based upon that similar *force majeure* clause, the Queens County court held that "the parties contemplated that an unanticipated event might occur and provided the parties would be obligated to 'pay any sums of money due' regardless of the circumstances. Accordingly, the plaintiff has not established a likelihood of success on the merits on its claims of impossibility and frustration of purpose. . . ." *Id.* at 4.

More recently, in *Valentino U.S.A., Inc. v. 693 Fifth Owner LLC*, Index No. 652605/2020, Doc. No. 44 (Sup. Ct. N.Y. Cty. Jan. 27, 2021), a New York County Commercial Division Judge dismissed a declaratory judgment action by a retailer to terminate its lease on the basis of frustration of purpose and impossibility, given the language of the lease's *force majeure clause*:

> Section 21.11. <u>Unavoidable Delays and Postponement of Performance</u>. In the event that either party hereto shall be delayed or hindered in or prevented from the performance of any act required hereunder by reasons of strikes, labor troubles, inability to procure labor or materials, failure of power, restrictive governmental laws or regulations, riots, insurrection, war, acts of terrorism, acts of God, floods, hurricanes, windstorms, fire or other casualty, condemnation or other reason of a similar or dissimilar nature beyond the reasonable control of the party delayed in performing work or doing acts required under the terms of this Lease (each an "Unavoidable Delay"), then performance of such act shall be excused for the period. . . . Notwithstanding the foregoing, after the Commencement Date, which date shall be subject to an Unavoidable Delay occasioned by the above causes, ***nothing contained in this Section shall operate to excuse Tenant from the prompt payment of Rent or any other payments or charges required by the terms of this Lease***…

Doc. No. 23 § 21.11 (emphasis added).

The *Valentino* court held that "the parties expressly allocated the risk that Valentino would not be able to operate its business and that Valentino is therefore not forgiven from its performance, including its obligation to pay rent by virtue of a state law." The Court added that the absence of a reference to a "pandemic" in the lease was immaterial since "the Lease is drafted broadly and encompasses the present situation by . . . including 'restrictive governmental laws or regulations,'

certain cataclysmic events, 'or other reason of a similar or dissimilar nature beyond the reasonable control of the party delayed in performing work or doing acts required.'" *Id.* (citing *Victoria's Secret Stores, LLC v. Herald Sq. Owner LLC*, 70 Misc. 3d 1206[A], 2021 NY Slip Op 50010[U] (Sup. Ct. N.Y. Cty. Jan. 7, 2021)); *see also Backal Hospitality Grp. LLC v. 627 West 42nd Retail LLC*, Index No. 154141/2020, 2020 N.Y. Misc. LEXIS 4050, at *12-13 (Sup. Ct. N.Y. Cty. Aug. 3, 2020) (party that "attempted to unilaterally terminate" lease due to pandemic could not establish a likelihood of success where "the terms" of the lease "contemplated a scenario in which performance of the lease terms by plaintiffs might become prohibited by a governmental order").

Caselaw in this Circuit uniformly upholds parties' agreed-upon allocation of financial risk: For example, in *Sage Realty Corp. v. Jugobanka*, No. 95 Civ. 0323, 1998 U.S. Dist. LEXIS 15756 (S.D.N.Y. Oct. 8, 1998), a Yugoslavian bank claimed that its New York lease was frustrated after OFAC revoked its license to do business in the United States.  Yet the lease allocated such risk to the bank, providing that "the obligation of Tenant to pay rent hereunder . . . shall in no way be affected, impaired or excused because Landlord is unable to fulfill any of its obligations under this Lease . . . by reason of any rule, order or regulation of any department or subdivision thereof of any government agency."  *Id.* at *13-14.  On the basis of this contractual language, the court ruled in favor of the landlord: "While the order prevented Jugobanka from conducting business in the United States and, therefore, destroyed Jugobanka's reason for entering into the lease, it did not prevent Jugobanka from paying rent for the office space."  *Id.* at *16.

In *Axginc Corp. v. Plaza Automall, Ltd.*, No. 14-CV-4648(ARR)(VMS), 2017 U.S. Dist. LEXIS 227928 (E.D.N.Y. Feb. 21, 2017), *aff'd*, 759 Fed. Appx. 26 (2d Cir. 2018), an auto dealership claimed that its lease of an auto storage facility was frustrated following Hurricane Sandy when it could no longer obtain insurance for vehicles stored at the facility at the South

Brooklyn Marine Terminal. *Id.* at *21. Judge Ross rejected this claim and held that "commercial impracticability and frustration of purpose defenses are barred by the express language of the contract, which, as described above, bars Plaza from bringing any defenses in an action for non-payment of rent." *Id.* On appeal, the Second Circuit affirmed Judge Ross's decision: "As the court below noted . . . these defenses are barred by the language of the Sublease." 759 Fed. Appx. at 29.

In the instant matter, Williamsburg Climbing's Lease contains a series of provisions that each on their own would bar Plaintiffs' common law defenses and, when taken together, make unmistakably clear that the sophisticated commercial parties specifically allocated the financial risk of exigent events outside of their control to Plaintiffs.

***First,*** just as in *Christian Louboutin*, *United Artists*, and *Valentino*, here, the Lease's *force majeure* clause contains the language "other than the payment of Fixed Rent or Additional Rent," thus specifically excluding the payment of rent from those obligations that may be excused upon "strikes, lockouts, failure of power or other utilities, injunction or other court or administrative order, ***governmental law or regulations which prevent or substantially interfere with the required performance***, condemnations, riots, insurrections, martial law, civil commotion, war, fire, flood, earthquake, or other casualty, ***acts of God, or other causes not within the control of such party***." (Lease § 59 (emphasis added)). This constitutes an express allocation of financial risk that requires Williamsburg Climbing to continue paying rent despite such events outside the control of the parties. *See 35 E. 75th St. Corp. v. Christian Louboutin L.L.C.*, 2020 N.Y. Misc. LEXIS 10423 (Sup. Ct. N.Y. Cty. Dec. 9, 2020), *United Artists' Theatre Circuit, Inc.*, Doc. No.

60 (Sup. Ct. Queens Cty. Dec. 9, 2020); *Valentino U.S.A., Inc. v. 693 Fifth Owner LLC*, I Doc. No. 44 (Sup. Ct. N.Y. Cty. Jan. 27, 2021).[1]

**Second**, the Lease provides that rent is to be paid "without any offset, set-off, counterclaim or deduction whatsoever." (Lease § 41). Under New York law, this language constitutes a waiver of all defenses. *See B. v. D. Co. v. Marine Midland Bank-New York*, 60 A.D.2d 544, 544 (1st Dep't 1977) (term for rent payment "without deduction or set-off, except as permitted by the Leases" was waiver of all defenses); *Cut-Outs, Inc. v. Man Yun Real Estate Corp.*, 286 A.D.2d 258, 260 (1st Dep't 2001) (provisions "specifically authorized defendant to perform the work in question without incurring liability to plaintiff, and without abating plaintiff's obligation to pay rent" and thus barred claims for "partial actual eviction or constructive eviction"); *Internet Law Library, Inc. v. Southridge Capital Mgmt., LLC*, No. 01 Civ. 6600(RLC), 2005 U.S. Dist. LEXIS 32299, at *27 (S.D.N.Y. Dec. 12, 2005) ("plaintiff specifically waived his right to protest payment

---

[1] *See also Charlotte School of Law*, 2018 NCBC 80, at *28 (N.C. Super. Ct. Mecklenburg Cty. 2018) (rejecting frustration claim since "[t]he fact that the Lease expressly excepts CSL's rent payment obligation from the protections of the *force majeure* clause precludes CSL's argument that it is somehow excused from paying rent because it lost its license to operate a law school"); *Stanley Works v. Halstead New Eng. Corp.*, No. CV010506367S, 2001 Conn. Super. LEXIS 1382, at *16-17 (Conn. Super. Ct. May 18, 2001) ("The *force majeure* provision states, 'LICENSEE shall not be released from any of its obligations to make ROYALTY PAYMENTS.' Accordingly, the court does not reach the [] impossibility defense"); *LIDC I, LLC v. Sunrise Mall, LLC*, 46 Misc. 3d 885, 890-91 (Sup. Ct. Nassau Cty. Oct. 27, 2014) ("the Town's actions were sufficient to invoke the force-majeure clause as a result of governmental action. . . . However, [] rent is excepted under the leases' force-majeure clause. . . ."); *476 Grand, LLC v. Dodge of Englewood, Inc.*, No. A-2048-10T1, 2012 N.J. Super Unpub. LEXIS 457, at *9-10 (N.J. App. Div. Mar. 2, 2012) ("In accepting an exclusion of rent from the *force majeure* clause, defendant agreed to pay rent regardless of circumstances beyond its control. Courts give effect to defendants' acceptance of this absolute obligation to pay rent in accordance with the contract terms. . . . This is a risk defendant assumed under the terms of the contract."); *Northway McGuffey College, Ltd. v. Brown*, No. 14 CV 993, 2015 Ohio Misc. LEXIS 15633, at *4-5 (Ohio Ct. Com. Pl. Jan. 6, 2015) ("The *Force Majeure* provision itself provides that, even if applicable under these circumstances, it does not operate to excuse Defendants from paying rent otherwise due pursuant to the terms of the Lease. Therefore, the Magistrate finds that this argument is without merit.").

of the note. [] ('all payments of principal and interest shall be made without setoff, deduction or counterclaim.') Under New York law, such a waiver among sophisticated parties ***is effective to overcome virtually any defense to enforcement***.") (emphasis added); *CAMOFI Master LDC v. College P'ship, Inc.*, 452 F. Supp. 2d 462, 477 (S.D.N.Y. 2006) ("plaintiff specifically waived his right to protest payment of the Notes. By the terms of the Notes, College Partnership pledged that '[e]ach payment of principal and of interest shall be paid . . . without setoff or counterclaim.'").

*Third*, the Lease contains a broad "No Liability" provision reiterating that "***the obligations of Tenant hereunder shall be in no way affected, impaired or excused*** . . . because Landlord is unable to fulfill, or is delayed in fulfilling, any of its obligations under this Lease by reason of strike, other labor trouble, governmental preemption of priorities or other controls in connection with a national or other public emergency or shortages of fuel, supplies or labor resulting therefrom, ***or any other cause, whether similar or dissimilar, beyond Landlord's reasonable control***."[2] (Id. § 59 (emphasis added)). This provision again makes clear that the financial risk of extraordinary events outside of the parties' control—"whether similar or dissimilar" to those specifically listed—is allocated to Williamsburg Climbing. *See, e.g., One World Trade Ctr. LLC v. Cantor Fitzgerald Secs.*, 6 Misc. 3d 382, 386 (N.Y. Sup. Ct. N.Y. Cty. Oct. 7, 2004) ("Defendants bargained away their right to hold the lessor liable for nonperformance in the face of the tragic, unanticipated events which destroyed the building . . . the *force majeure* specifically shields the lessor from liability for any nonperformance that results from the acts of third parties, and therefore bars defendants' counterclaims for a refund of rent"); *Light's Jewelers, Inc. v. N.Y.*

---

[2] Corbin on Contracts: Force Majeure and Impossibility of Performance Resulting from COVID-19 § 1.03[6] (Matthew Bender 2020) (noting that the "whether similar or dissimilar" clause is used by "[p]rudent drafters" to "draft[] around the canons of construction" and "make clear" that the clause "it not limited to the same type of events" specifically listed).

*Tel. Co.*, 182 A.D.2d 965, 966 (3d Dep't 1992) (enforcing provision that party "shall not be responsible for failure to render service due to . . . causes beyond its' *sic* control").

**Fourth**, the Lease contains a broad "As Is" provision wherein Williamsburg Climbing "waives any claims or action against Landlord in respect of the condition of the Premises," and concedes that Ronit makes no warranty, representation, or covenant with respect to "**FITNESS FOR USE, DESIGN OR CONDITION FOR ANY PARTICULAR USE OR PURPOSE . . . IT BEING AGREED THAT ALL SUCH RISKS ARE TO BE BORNE BY TENANT**." (Lease § 42 (emphasis in original)).  This language bars Williamsburg Climbing's claim that the fitness of the premises for any particular purpose was a basic assumption underlying its obligation to pay rent.  To the contrary, all such risk of the premises not being fit for a particular purpose was allocated to Williamsburg Climbing.  *See*, *e.g.*, *Lake Altoona Rehab. & Prot. Dist. v. Jereczek*, No. 2016AP2165, 2018 Wisc. App. LEXIS 331, at *9 (Wis. Ct. App. Mar. 20, 2018) ("The contract specified that the [plaintiff] 'makes no warranty of the sand for any purpose' and [defendant] 'buys sand 'as is.'' . . . . Therefore, it cannot be said that resale of the sand as frac sand was a basic assumption of the contract. Accordingly, the frustration of purpose doctrine does not apply.").[3]

**Fifth**, the Lease contains a specific provision making clear that the financial risk of governmental action on "the purposes to which the demised premises are put, or manner of use of the demised premises" are specifically allocated to Williamsburg Climbing alone:

---

[3] *See also Baldiga v. C.A. Acquisition Corp.*, 496 B.R. 49, 55 (Bankr. D. Mass. 2013) ("defense of frustration of purpose is not available" where "the risk of loss of any of the debtor's assets was more than tacitly assigned to the promisor" which took assets "'[a]s is' without any representations or warranties"); *Man Roland, Inc. v. Quantum Color Corp.*, 57 F. Supp. 2d 576, 580-81 (N.D. Ill. 1999) (As-Is "language clearly communicates that all warranties are excluded and shifts any risk of loss to the purchaser. . . Because this court has previously found this provision to be operative and this provision allocates the risk of loss to Quantum, Quantum's affirmative defenses of mutual mistake and unilateral mistake fail to state a claim.").

Tenant shall, *at its sole cost and expense*, promptly comply with all present and future laws and ordinances of all federal, state, county and municipal governments, and appropriate departments, commissions, boards and officers thereof, and the requirements of any insurer of the Demised Premises or the Board of Fire Underwriters or any other body now or hereafter exercising similar functions, *foreseen or unforeseen, ordinary as well as extraordinary, and whether or not the same shall presently be within the contemplation of the parties hereto* or shall involve any change of governmental policy or require repairs, alterations, equipment or additions or any work of any kind and *irrespective of the cost thereof*, which may be applicable to the demised premises including, without limitation, the fixtures and equipment thereof, the plumbing, heating, ventilating and air-conditioning systems thereof, *or the purposes to which the demised premises are put, or manner of use of the demised premises*. Tenant's obligations hereunder shall include compliance with all laws, rules, regulations or requirements relating to the operation of the Permitted Uses.

(*Id.* § 44.07 (emphasis added)).

*Sixth*, the Lease provides that Williamsburg Climbing was to procure "All Risk" business interruption or earnings insurance for a period of not less than twelve (12) months to cover extraordinary losses.  (*Id.* § 51.02(a)(iv)).  This is further evidence that the parties specifically allocated the risk of extraordinary business interruptions to Williamsburg Climbing.  *See, e.g.*, *Bayou Place Ltd. P'ship v. Alleppo's Grill, Inc.*, No. RDB-18-2855, 2020 U.S. Dist. LEXIS 43960, at *21 (D. Md. Mar. 13, 2020) ("nothing on record suggests the parties bargained 'on the basic assumption' that an interruption would not occur, or that Tenant's business would remain profitable.  Rather, as both parties note, Defendants were contractually obligated to obtain business interruption insurance sufficient to provide for twelve months' rent."); Restatement (Second) of Contracts § 261 cmt. c ("A commercial practice under which a party might be expected to insure or otherwise secure himself against a risk also militates against shifting it to the other party.").

The foregoing provisions make abundantly clear that the parties specifically contemplated extraordinary governmental regulations, acts of God, and other unforeseen and extraordinary events outside of their control that might impact Williamsburg Climbing's ability to do business

20

and its profitability.  And the Lease provides—yet again and again—that the parties specifically allocated the financial risk of such events to Williamsburg Climbing, which agreed to continue paying rent.  For Ronit, a family-run entity, which would be making a substantial up-front investment to be recouped over time, this allocation of risk was core to the bargain struck.

In sum, the language of the Lease precludes further consideration of the common law doctrines of impossibility and frustration of purpose.

### B.      **The Lease Has Neither Been Frustrated Nor Rendered Impossible**

The doctrines of frustration of purpose and impossibility also do not apply because the Lease has not been frustrated, nor has performance been rendered impossible.

The doctrine of frustration of purpose "is a narrow one."  *Crown IT Servs. v. Koval-Olsen*, 11 A.D.3d 263, 265 (1st Dep't 2004).  For the defense to potentially apply, "[t]he frustration must be total or nearly total – in more modern terminology the principal purpose of the promisor (the one seeking to use to the defense) must be either totally or substantially frustrated."  *Noble Am. Corp. v. CIT Group/Equip. Fin., Inc.*, No. 602269/2009, 2009 N.Y. Misc. LEXIS 6780, at *7 (Sup. Ct. N.Y. Cty. Dec. 8, 2009) (quoting Calamari and Perillo on Contracts § 13.12 (5th ed. 2003)).  As explained by the New York Court of Appeals:

> In short, the applicable rules do not permit a party to abrogate a contract, unilaterally, merely upon a showing that it would be financially disadvantageous to perform it; were the rules otherwise, they would place in jeopardy all commercial contracts. If, in fact, the agreement expresses or implies a promise that the hotel would remain liable for the contract term, that promise should be honored, regardless of financial hardship.

*407 East 61st Garage, Inc. v. Savoy Fifth Ave. Corp.*, 23 N.Y.2d 275, 282 (1968).

Here, Plaintiffs cannot meet this high threshold for a frustration defense.

***First,*** when it terminated its ten-year Lease in May 2020, Williamsburg Climbing was months away from opening.  The Lease was to continue until at least January 2029.  Thus, while

the pandemic might impact the facility's early months, in the context of a ten-year term with two ten-year renewal options, the Lease was not totally or substantially frustrated.

"Under New York law, the doctrine of frustration of purpose discharges a party's duties to perform under a contract where 'an unforeseen event has occurred, which, ***in the context of the entire transaction***, destroys the underlying reasons for performing the contract, even though performance is possible.'" *Gander Mountain Co. v. Islip U-Slip LLC*, 923 F. Supp. 2d 351, 359 (N.D.N.Y. Feb. 11, 2013) (emphasis added) (citation omitted); *Robitzek Investing Co. v. Colonial Beacon Oil Co.*, 265 A.D. 749, 753 (1st Dep't 1943) (noting in context of 15-year lease that "[w]ere we to accept defendant's interpretation of the agreement, any rule, order or regulation of public authority even of temporary duration which might affect defendant's business . . . would allow defendant to cancel the lease"); *Christian Louboutin L.L.C.*, 2020 N.Y. Misc. LEXIS 10423, at *7 (Sup. Ct. N.Y. Cty. Dec. 9, 2020) (refusing retailer's request to "simply walk away with nearly a decade left on [its] lease" due to pandemic).

***Second***, fitness facilities have been permitted to reopen since August 24, 2020, albeit at reduced capacity, and the purposes of the Lease have thus not been completely frustrated.

Squarely on point is *Robitzek Investing*, where a gas station claimed that its lease was frustrated by wartime measures that limited it to twelve-hour days and prohibited the sale of rubber tires, casings, and tubes. 265 A.D. at 751-53. The First Department flatly rejected the frustration defense: "Where there is complete frustration of performance of a contract by act of the government, cancellation is permissible. . . . Here there is not complete frustration. Defendant could have continued to operate the gasoline station at the demised premises within the terms of the lease though the volume of its business might have suffered substantial diminution because of the Federal regulatory measures." *Id.*; *Gander Mt. Co*, 923 F. Supp. 2d at 362 (N.D.N.Y. 2013)

22

("[w]hile it may be financially difficult or unprofitable for plaintiff to continue to operate their retail store, that does not excuse plaintiff's obligation to perform under the terms of the Lease"); *Dr. Smood N.Y. LLC v. Orchard Houston, LLC*, No. 652812/2020, 2020 N.Y. Misc. LEXIS 10087, at *6 (Sup. Ct. N.Y. Cty. Nov. 2, 2020) (restaurant lease not frustrated due to pandemic-related closure orders since "the premises remain open for both counter service and pickup of orders submitted online"); *Christian Louboutin L.L.C.*, 2020 N.Y. Misc. LEXIS 10423, at *5 ("market changes happen all the time. . . unforeseen economic forces, even the horrendous effects of a deadly virus, do not automatically permit the Court to simply rip up a contract signed between two sophisticated parties"); *RPH Hotels 51st St. Owner, LLC v. HJ Parking LLC*, No. 654938/2020, 2021 N.Y. Misc. LEXIS 373, at *7 (Sup. Ct. N.Y. Cty. Jan. 28, 2021) ("Quite simply, here, where there is a downturn in a tenant's business—with or without Covid—it does not invoke the doctrine of impossibility of performance, especially when the business is operating.").

**Third**, Plaintiffs' attempt to minimize the elephant-in-the-room—*i.e.*, the fact that Brooklyn Boulders currently operates *all five of its locations*, including both of its New York facilities (*see* Weitzman Decl., Exs. P-S), while Fifth Concerto is seeking cheaper space elsewhere in Brooklyn for a new gym (*Id.*, Ex. O)—by claiming that the Williamsburg "facility design and business model were being constructed to be significantly different from a traditional rock-climbing gym." (Compl. ¶ 15). However, this made-up claim is barred by the Lease's "Permitted Uses" clause, which simply calls for use as an "indoor climbing facility" and permits a variety of incidental uses, including even "collaborative office space." (*Id.* § 62(a),(b)).

In *Colonial Operating Corp. v. Hannan Sales & Service*, 265 A.D. 411 (2d Dep't 1943), a "lease specified that the premises were 'to be used and occupied only for a showroom for automobiles and automobile accessories." *Id.* at 412. Following a World War II bar on the sale

23

of *new* automobiles, the lessee claimed that the lease had been frustrated because "the parties intended that the demised premises should be used as a showroom where only *new* automobiles and automobile accessories could be sold." *Id.* at 413 (emphasis added).  The Second Department rejected the lessee's attempt to offer parol evidence to narrow the lease's permitted use clause:

> The use clause was clear and unambiguous. Hence it was not the proper subject of parol evidence to limit or qualify the words "automobiles" and "automobile accessories" therein, by inserting the qualifying or limiting term "new" which the parties did not employ in the writing and which the court may not interpolate.

*Id.* at 413;[4] *S. College St., LLC v. Charlotte School of Law*, 2018 NCBC 80 (N.C. Super. Ct. Mecklenburg Cty. 2018) (rejecting frustration claim since "[t]he Lease, however, expressly contemplates use of the Premises other than as an educational institution. . . . Thus, the express language of the Lease does not support CSL's position that there is an implied condition in the Lease that CSL be able to operate a law school on the Premises and that CSL's inability to do so should excuse performance.").  The foregoing caselaw makes clear that the Lease has neither been frustrated nor rendered impossible as a matter of law.

## II.   WILLIAMSBURG CLIMBING HAS FURTHER BREACHED THE LEASE BY FAILING TO DISCHARGE MECHANICS' LIENS

Williamsburg Climbing breached the Lease when, after abandoning the Property, it: (i) allowed nine mechanic's liens to be filed against the Property; (ii) failed to discharge the liens; and (iii) failed to defend or indemnify Ronit in connection with the liens.  These actions constitute breaches of Sections 43.06 and 66(c) of the Lease, which provide, in pertinent part, that:

- "[Williamsburg Climbing] shall not permit any mechanic's or other liens to be filed . . . in connection with . . . work claimed to have been done for, or materials furnished to, [Williamsburg Climbing]…."  (Lease § 43.06)

---

[4] Williston on Contracts § 77:97 ("Most 'standard form' leases [] provide a blank space for the tenant to write in the intended use of the premises.  [This] makes the tenant's intent known to the building owner so that both parties go into the leasehold transaction with their eyes wide open.").

- Williamsburg Climbing, at its "sole cost and expense, shall defend, indemnify and save Landlord harmless from and against all such liens" and "shall satisfy, cancel or discharge all such liens . . . within thirty (30) days . . . ." (*Id.*); and

- Within 30 days after the filing of any mechanic's lien "for work claimed to have been done for, or materials claimed to have been furnished to [Williamsburg Climbing]", Williamsburg Climbing is required to discharge such lien. (*Id.* § 66(c).)

Plaintiffs are therefore liable to Ronit for these additional breaches.

## III.   FIFTH CONCERTO HAS BREACHED THE GUARANTY

Pursuant to the Guaranty, Fifth Concerto agreed to "absolutely, irrevocably and unconditionally guarantee[] to Landlord the punctual payment, performance and fulfillment of all of the Obligations" of Williamsburg Climbing and to pay "[a]ll losses, damages, and other costs and reasonable expenses of whatsoever nature which Landlord incurs in connection with or incidental to the enforcement of the performance of any of the Guarantor's obligations under this Guaranty, including reasonable attorney's fees. . . ." (Weitzman Decl., Ex. F). Fifth Concerto has failed to perform under the Guaranty, and the Court should therefore grant summary judgment to Ronit on its claims against Fifth Concerto.

## CONCLUSION

For the foregoing reasons, Ronit respectfully requests that this Court grant its motion for an Order: (i) declaring that the lease between Ronit and Williamsburg Climbing has not been frustrated or rendered impossible and, therefore, Williamsburg Climbing did not lawfully terminate the lease; (ii) declaring that the obligations under the guaranty executed by Fifth Concerto have not been extinguished; and (iii) granting Ronit summary judgment on liability.

Dated: New York, New York
February 23, 2021

STEIN ADLER
DABAH & ZELKOWITZ LLP

By: _____

Adam J. Stein, Esq.
Matteo J. Rosselli, Esq.
Samuel J. Bazian, Esq.
1633 Broadway, 46th Floor
New York, New York 10019
(212) 867-5620
mrosselli@steinadlerlaw.com

*Attorneys for Defendant/Counterclaim-Plaintiff Ronit Realty LLC*

26