```
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
---------------------------------------------------x
```
WILLIAMSBURG CLIMBING GYM
COMPANY, LLC and
FIFTH CONCERTO HOLDCO, INC.,

        Plaintiffs,

  -against-

RONIT REALTY LLC,

        Defendant.

**MEMORANDUM AND ORDER**

Case No. 1:20-cv-2073 (FB) (RML)

*Appearances:*
*For the Plaintiffs*:
MICHAEL J. LANE
Anderson Kill & Olick, P.C.
1251 Avenue of the Americas
New York, NY 10020

RICHARD ANTHONY COPPOLA
Cullen and Dykman LLP
44 Wall Street, 17th Floor
New York, NY 10005

*For the Defendant*:
ADAM STEIN
MATTEO J. ROSSELLI
SAMUEL JUDAH BAZIAN
Stein Adler Dabah & Zelkowitz LLP
1633 Broadway
Suite 46th
New York, NY 10019

**BLOCK, Senior District Judge:**

    Plaintiffs Williamsburg Climbing Gym Company ("Williamsburg Climbing Gym") and Fifth Concerto Holdco, Inc. ("Fifth Concerto," together with Williamsburg Climbing Gym, "Brooklyn Boulders") bring this suit for declaratory judgment and recission of their lease with Defendant Ronit Realty LLC ("Ronit").

1

The parties have cross-moved for summary judgment as to the issue of liability under Federal Rule of Civil Procedure 56.

## I.    FACTS

The following facts are taken from the pleadings, the parties' Rule 56.1 statements, and supporting documentation. They are undisputed unless otherwise noted.

Fifth Concerto constructs and operates rock-climbing gyms under the brand name "Brooklyn Boulders." It sought to open a climbing gym in Williamsburg, Brooklyn, and formed Williamsburg Climbing Gym for that purpose. On November 30, 2018, Williamsburg Climbing Gym and Ronit executed a ten-year lease (the "Lease")[1] for approximately 30,500 square feet of interior space and approximately 3,000 square feet of outdoor terrace space. The Lease provides for base rent of $1,957,500 per year, and Ronit agreed to contribute up to $2,775,000 towards Brooklyn Boulders' buildout of the premises. Fifth Concerto guaranteed the Lease (the "Guaranty").

Brooklyn Boulders began its buildout in November 2019. Between that time and March 2020, Ronit remitted approximately $1,200,000 in construction contributions to Brooklyn Boulders. On March 7, 2020, then-Governor Andrew

---

[1] Both parties have attached copies of the Lease. The Lease consists of a form lease, a rider containing specific provisions, and an amendment.

Cuomo issued an executive order that required gyms to cease operations because of the COVID-19 pandemic. At that time, the leased premises were not yet open for business.

On May 1, 2020, Brooklyn Boulders informed Ronit that it was terminating the Lease based upon the doctrines of frustration of purpose and impossibility, and delivered a letter to that effect dated May 5, 2020. Brooklyn Boulders has not paid amounts due under the Lease since May 2020.

Brooklyn Boulders filed the instant suit on May 5, 2020, seeking a declaratory judgment that its termination and recission of the Lease was lawful. In response, Ronit leveled counterclaims against Brooklyn Boulders for breach of the Lease, breach of the Guaranty, anticipatory repudiation of both the Lease and the Guaranty, and specific performance of both the Lease and the Guaranty. The parties have cross-moved for summary judgment.

## II.  SUMMARY JUDGMENT

On a motion for summary judgment, the court must "resolv[e] all ambiguities and draw[] all permissible factual inferences in favor of the party against whom summary judgment is sought." *Sloley v. VanBramer*, 945 F.3d 30, 36 (2d Cir. 2019) (*citing Burg v. Gosselin*, 591 F.3d 95, 97 (2d Cir. 2010)). Summary judgment is appropriate only if the pleadings, the discovery materials on file, and any affidavits

3

show "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).

The same standards are applicable to cross-motions for summary judgment: "[E]ach party's motion must be examined on its own merits, and in each case all reasonable inferences must be drawn against the party whose motion is under consideration." *Morales v. Quintel Entm't, Inc.*, 249 F.3d 115, 121 (2d Cir. 2001) (internal citation and quotation omitted).

### III.   FRUSTRATION OF PURPOSE AND IMPOSSIBILITY

"The doctrine of frustration of purpose discharges a party's duties to perform under a contract where a 'wholly unforeseeable event renders the contract valueless to one party.'" *Axginc Corp. v. Plaza Automall, Ltd.*, 759 F. App'x 26, 29 (2d Cir. 2018) (citing *United States v. Gen. Douglas MacArthur Senior Vill., Inc.*, 508 F.2d 377, 381 (2d Cir. 1974)). For the doctrine to apply, the purpose frustrated must be "so completely the basis of the contract that, as both parties understood, the transaction would have made little sense," in its absence, and the event frustrating performance must be "virtually cataclysmic and wholly unforeseeable." *Gap Inc. v. Ponte Gadea New York LLC*, 524 F. Supp. 3d 224, 234 (S.D.N.Y. 2021) (internal citation and quotation omitted).

Similarly, "impossibility . . . is a defense to a breach of contract action 'only when . . . performance [is rendered] objectively impossible . . . by an unanticipated

4

event that could not have been foreseen or guarded against in the contract.'" *Id.* at 237 (quoting *Axginc*, 759 F. App'x at 29). "Economic hardship, even to the extent of bankruptcy or insolvency, does not excuse performance under the doctrine of impossibility." *Gap*, 524 F. Supp. 3d at 237 (internal quotation omitted).

Both doctrines are construed "narrowly, due in part to judicial recognition that the purpose of contract law is to allocate the risks that might affect performance and that performance should be excused only in extreme circumstances." *Kel Kim Corp. v. Cent. Markets, Inc.*, 70 N.Y.2d 900, 902 (1987). Neither doctrine applies here.

### A.   Foreseeability

For either of these interrelated doctrines to apply, the intervening event must be unforeseeable. Where the parties have provided for an event in a lease, they have foreseen the possibility that it could occur. That is the case here: the Lease recognizes and provides for instances in which "governmental law or regulations . . . prevent or substantially interfere with the required performance. . . ." Lease at § 59. Though they may not have specifically predicted the pandemic, the parties identified the possibility that government action might hinder Brooklyn Boulders' use of the premises, "defeating any claim that the possibility was wholly unforeseeable." *Id.* at 234 (internal quotation and citation omitted). Accordingly, Brooklyn Boulders has failed to establish the first prong of either doctrine.

## B. Frustration or Impossibility of Performance

In addition, a party claiming frustration must demonstrate that the intervening event completely frustrated the purpose underlying the lease. "It is not enough that the transaction will be less profitable for an affected party or even that the party will sustain a loss." *Id.* (internal citation and quotation omitted). And to prevail on a claim of impossibility, a party must demonstrate that performance is "objectively impossible." *Kel Kim*, 70 N.Y.2d at 902. "[W]hile New York courts excuse a party from performing obligations that are impossible to perform, . . . impossibility does not excuse performance of a contract merely because the performance would be burdensome or unprofitable." *CAI Rail, Inc. v. Badger Mining Corp.*, No. 20 CIV. 4644 (JPC), 2021 WL 705880, at * 7 (S.D.N.Y. Feb. 22, 2021) (citation omitted).

Brooklyn Boulders terminated a ten-year lease prior to completing its buildout or opening its doors for business. It claims that the purpose of the Lease was not simply to operate a climbing gym, but rather to operate a very specific business model:

> [T]he Williamsburg facility is based on a model . . . whereby group fitness studio style rooms are filled with customers, each assigned to an exercise station and classes are led by a live instructor. This model not only presumes the ability to convene classes where people are densely packed but also that this tight co-mingling with like-minded individuals is in-fact [sic] a significant part of the appeal.

Compl. at ¶ 16. Brooklyn Boulders pursued the same tack at oral argument, asserting that "[t]he BKBX model . . . requires 24 people in a small room doing exercises.

6

That is not possible." Tr. at 7. However, the Lease itself provides for a much broader use:

> Tenant shall operate its business in the Demised Premises during the Term and occupy the Demised Premises primarily as an indoor climbing facility, and may also use the Demised Premises for other uses incidental to the primary use, such as for a fitness center or studios, a juice bar, a café, lounge, restaurant or bar (including the sale of alcohol and food), lounges, general office space in connection with the conduct of Tenant's business or for coworking, event space (e.g., birthday parties), for the retail sale of merchandise related to Tenant's primary use and for collaborative office space . . . .

Lease at § 62(b). In addition, the Lease contains a merger clause. *Id.* at § 77. Therefore, Brooklyn Boulders argument that the Lease's purpose was confined to its group fitness business model relies on improper parol evidence. *See Colonial Operating Corp. v. Hannan Sales & Service*, 265 A.D. 411 (2d Dep't 1943) (prohibiting parol evidence to demonstrate frustration).

In any event, it does not matter whether the Court uses the narrow purpose proposed by Brooklyn Boulders or the broader one in the Lease: in either case, Brooklyn Boulders has failed to demonstrate complete frustration. First, Brooklyn Boulders could have adjusted its business model to reflect the changing regulatory environment. *See 35 East 75th Street Corp. v. Christian Louboutin L.L.C.*, No. 154883/2020, 2020 WL 7315470 at *2 (N.Y. Sup. Ct. Dec. 09, 2020) ("[D]efendant's business model of attracting street traffic is no longer profitable because there are dramatically fewer people walking around due to the pandemic.

7

But market changes happen all the time."); *Byrnes v. Balcom*, 265 A.D. 268, 270 (3d Dep't 1942) (Automobile dealership could adjust its business model within the terms of the lease). Indeed, Brooklyn Boulders does not dispute that five of its other locations, including two in New York, are open for business seven days a week, although at reduced capacities. In fact, in June 2020, Brooklyn Boulders sought additional space to open another climbing gym location.

Second, the Lease provides for an initial term of ten years. The executive orders provided for a temporary, albeit indeterminate, period of shutdown, and gyms were permitted to reopen on August 24, 2020. Against a ten-year time horizon, this temporary period does not "so completely frustrat[e]" the Lease as to terminate it, and the doctrine of impossibility does not apply to "temporary hardship[s]." *Greater N. Y. Auto. Dealers Ass'n, Inc. v. City Spec, LLC*, 70 Misc.3d 1209(A), at *9 (N.Y. Civ. Ct. 2020) ("[E]ven if Respondent were forced by the Executive Order to close in-person operations at the Premises, a four-month closure out of a five-year lease did not frustrate the overall purpose of the Lease."); *Bay Plaza Community Center, LLC v. Bronx Vistasite Eyecare, Inc.*, No. 656407/2020, 2021 WL 1794562, at *2 (N.Y. Sup. Ct. May 05, 2021).

All Brooklyn Boulders has managed to demonstrate here is that, as a result of the emergency measures undertaken for public safety during the pandemic, its business model was not profitable. That is not enough. That a business might "suffer

8

particularly adverse financial consequences from the COVID-19 pandemic does not amount to frustration of the purpose of the Lease." *Gap, Inc.*, 524 F. Supp.3d at 236; *see also CAI Rail*, 2021 WL 705880 at *8 ("[A] party is not excused from a contract simply because it becomes more economically difficult to perform."). Likewise, Brooklyn Boulders has failed demonstrate objective impossibility. Accordingly, Brooklyn Boulders' motion for summary judgment is DENIED.

## IV.   BREACH OF CONTRACT

Ronit cross-moves on the basis of breach of contract. "Under New York law,[2] if a contract is straightforward and unambiguous, its interpretation presents a question of law for the court to be made without resort to extrinsic evidence." *Spinelli v. Nat'l Football League*, 903 F.3d 185, 200 (2d Cir. 2018) (internal citation and quotation omitted). If, however, "the intent of the parties can[not] be ascertained from the face of their agreement, the contract is ambiguous and its interpretation presents a question of fact." *Id.* (internal citation and quotation omitted).

Here, the Lease is not ambiguous. Its provisions are clear, and they provide that Brooklyn Boulders is liable. First, the Lease contains a *force majeure* clause:

> In the event that either party shall be delayed or hindered in or prevented from the performance of any covenant, agreement, work, service, or other act required under this Lease to be performed by such party, other than the payment of Fixed Rent or Additional Rent by Tenant, and such delay or hindrance is due to strikes, lockouts, failure of power or other utilities, injunction or other court or administrative

---

[2] The Lease provides that it is governed by New York law. Lease at § 85(b).

9

> order, *governmental law or regulations which prevent or substantially interfere with the required performance*, condemnations, riots, insurrections, martial law, civil commotion, war, fire, flood, earthquake, or other casualty, acts of God, *or other causes not within the control of such party*, the performance of any covenant, agreement, work, service, or other act, *other than the payment of Fixed Rent or Additional Rent by Tenant*, shall be excused for the period of delay and the period for the performance of the same shall be extended by the period.

Lease at ¶ 59 (emphasis added). That provision plainly provides that Brooklyn Boulders' obligation to pay rent is not abrogated by "governmental law or regulations which prevent or substantially interfere with the required performance," and that is what the Governor's order is. *Id.*

In addition, the Lease provides that risks associated with the use of the premises are borne by Brooklyn Bounders:

> **NEITHER LANDLORD, NOR ANY OF LANDLORD'S AGENTS, HAS MADE OR MAKES, ANY WARRANTY, REPRESENTATION, COVENANT OR PROMISE, EXPRESS OR IMPLIED, IN RESPECT OF THE PREMISES OR ANY PART THEREOF, EITHER AS TO THEIR FITNESS FOR USE, DESIGN OR CONDITION FOR ANY PARTICULAR USE OR PURPOSE . . . IT BEING AGREED THAT ALL SUCH RISKS ARE TO BE BORNE BY TENANT.**

*Id.* at § 42 (bolded and capital typeface original). Moreover, the Lease repeatedly allocates burdens and risks arising from government intrusion into Brooklyn Boulders' business upon Brooklyn Boulders. In § 62(b), the onus of operating the business "in accordance with all legal requirements" is placed on Brooklyn Boulders. The Lease also provides that any failure to procure necessary government

10

approvals does not "relieve [Brooklyn Boulders] from any of its obligations or liabilities under [the] Lease." Lease at § 62(c).

Elsewhere in the Lease, Brooklyn Boulders affirmatively agreed to comply with government regulations. Section 6 provides that Brooklyn Boulders

> shall at [its] own cost and expense, promptly comply with all present and future laws, orders and regulations of all state, federal, municipal and local governments, departments, commissions and boards and any direction of any public officer pursuant to law . . . which shall impose any violation, order or duty upon . . . [Brooklyn Boulders] with respect to the demised premises . . . .

Lease at § 6. Brooklyn Boulders also committed to

> comply with all Requirements which shall, with respect to the Premises or the use and occupation thereof . . . impose any violation, order, duty or obligation on [Ronit] or [Brooklyn Boulders] . . . arising from (i) the [Brooklyn Boulders'] use of the Premises, [or] (ii) the manner of conduct of business by [Brooklyn Boulders] in any portion of the Premises . . . .

Lease at § 44.01(a). Finally, the cost of compliance with unexpected government regulation was expressly allocated to Brooklyn Boulders:

> [Brooklyn Boulders] shall, at its sole cost and expense, promptly comply with all present and future laws and ordinances of all federal, state, county and municipal governments, and appropriate departments, commissions, boards and officers thereof . . . foreseen or unforeseen, ordinary as well as extraordinary, and whether or not the same shall presently be within the contemplation of the parties hereto or shall involve any change of governmental policy . . . irrespective of the cost thereof.

Lease at § 44.07.

11

Brooklyn Boulders and Ronit are sophisticated corporate actors. They negotiated a lease worth millions of dollars over the course of its term. That Lease is lengthy and specific, and it does not excuse Brooklyn Boulders from paying its rent in the unfortunate circumstances of this pandemic. Indeed, the *force majeure* clause and the clauses imposing upon Brooklyn Boulders the duty to comply with government regulations and orders make clear that the parties foresaw the risk of unfavorable changes in governmental regulations, and allocated that risk to Brooklyn Boulders.

The parties do not dispute that Brooklyn Boulders failed pay any sums due under the Lease since May 1, 2020. Therefore, it is in breach of the Lease. As a result, Fifth Concerto has breached the Guaranty, as well. Therefore, Ronit's motion for summary judgment as to liability is GRANTED.

## V. CONCLUSION

For the foregoing reasons, Brooklyn Boulders' motion for summary judgment is DENIED, and Ronit's motion for summary judgment as to liability is GRANTED. **SO ORDERED.**

  /S/ Frederic Block_____
FREDERIC BLOCK
Senior United States District Judge

Brooklyn, New York
January 5, 2022